DAVID L. ANDERSON (CABN 149604)
United States Attorney

HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

KAREN BEAUSEY (CABN 155258)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-6598
    FAX: (415) 436-7234
    Karen.Beausey@usdoj.gov

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. |
| Plaintiff, | |
| v. | **VERIFIED COMPLAINT FOR FORFEITURE <u>IN REM</u>** |
| $40,000 in United States Currency, | |
| Defendant. | |

The United States of America, by its attorneys, David L. Anderson, United States Attorney, and Karen Beausey, Assistant United States Attorney for the Northern District of California, brings this complaint and alleges as follows:

## NATURE OF THE ACTION

1. This is a judicial forfeiture action, as authorized by Title 21, United States Code, Section §§ 853 and 881(a)(6), involving the seizure and forfeiture to the use and benefit of the United States of America the following property:

$40,000 in United States Currency seized by law enforcement officers from James SPARKS on

1

or about September 10, 2019, and currently in the custody of the United States Drug Enforcement Administration ("DEA");

(hereinafter, "Defendant Property"), as property constituting, or derived from, any proceeds obtained, directly or indirectly, as a result of a violation of 21 U.S.C. §§ 841 and/or 846, and thereby forfeitable pursuant to 21 U.S.C. § 881(a)(6).

## JURISDICTION AND VENUE

2. This Court has jurisdiction under 28 U.S.C. §§ 1345 and 1355, and 21 U.S.C. § 881(a)(6).

3. Venue is proper in this district pursuant to 28 U.S.C. §§ 1355 and 1395 because the acts or omissions giving rise to the forfeiture occurred in this district and the Defendant Property is located in this district.

4. Intra-district venue is proper in the San Francisco within the Northern District of California.

## PARTIES

5. Plaintiff is the United States of America.

6. The Defendant Property consists of $40,000 in United States Currency seized by law enforcement officers from James SPARKS on or about September 10, 2019, and currently in the custody of the DEA.

## FACTS

7. On September 10, 2019, Cincinnati DEA Task Force Agent Ken Coyle received information from a confidential source (CS) that on September 9, 2019, SPARKS, Alberto Flores, and Andrea Ospina made round trip reservations to fly from Dallas, Texas to San Francisco International Airport (SFO) on September 10, 2019 (the next day), via American Airlines Flight #1260. Their flight was scheduled to arrive in San Francisco at 12:17 p.m. local time, but was delayed and did not arrive until around 1:40 p.m. SPARKS, Flores, and Ospina were scheduled to depart San Francisco for their

2

return flight to Dallas on September 11, 2019 at 6:00 p.m., less than 30 hours after arriving in San Francisco.

8. SPARKS paid $706.60 for each of the three airline tickets, and paid for each reservation on a credit card. SPARKS, Flores and Ospina sat together on the flight (in seats 34D, 34E, and 34F). Neither of the travelers checked any luggage on their San Francisco-bound flight.

9. TFO Coyle conducted a criminal history check of SPARKS, Flores, and Ospina, and found none had any prior criminal history. TFO Coyle passed the information he had learned about SPARKS, Flores, and Ospina to San Francisco DEA Task Force #2 at SFO.

10. Task Force #2 officer Blake Molyneux conducted a computer records check of SPARKS and located a Texas Driver's License.

11. In TFO Molyneux's training and experience, he knew that most travelers attempt to book airline travel at least two weeks in advance of the flight date in order to receive the lowest possible fare. He also knew that most travelers to the San Francisco Bay Area who come as tourists seek to stay for at least two days, and that most working people would consider paying $760 in airfare to visit the area for less than 30 hours to be an extravagance. On the other hand, in his experience individuals who fly to San Francisco with the intention of purchasing illegal drugs frequently make their airline reservations shortly before the date of travel and frequently spend very little time (often less than two days) in California before returning to their city of origin.

12. In light of the information related to them by TFO Coyle and what they viewed as the suspicious nature of SPARKS', Flores', and Ospina's travel, San Francisco Task Force #2 officers decided to meet SPARKS, Flores, and Ospina at SFO and to seek an interview with any or all of them regarding the purpose of their travel to California.

13. Accordingly, on September 10, 2019, at approximately 1:20 p.m., TFO Blake Molyneux other Task Force #2 agents established surveillance at American Airlines gate 45B in anticipation of the

3

arrival of passengers from American Airlines Flight #1260. At approximately 1:50 p.m., TFO Molyneux and TFO Steve Maes observed SPARKS (identified via comparison with his Texas Driver's License photograph) exist the gate in the company of a male companion (subsequently identified as Flores) and a female companion (subsequently identified as Ospina). All three were seen talking together as they walked together in the direction of the exit of the terminal. TFO Molyneux noticed Sparks was carrying a small backpack as his carry-on item.

14. A few minutes after SPARKS and his companions emerged from the aircraft, at approximately 1:55 p.m., Task Force agents approached the three traveling companions to conduct consensual conversations. TFO Maes and TFO Victor Bertolozzi approached Flores, TFO Ariana Daggett approached Ospina, and TFO Molyneux approached SPARKS (SA George Krieg joined TFO Molyneux and SPARKS a few minutes after their conversation began). TFO Molyneux called out to SPARKS by saying "James?" SPARKS acknowledged he was James and TFO Molyneux asked if SPARKS would speak with him. SPARKS replied, "yeah," indicating his agreement to speak with TFO Molyneux.

15. Before asking SPARKS any other questions, TFO Molyneux informed SPARKS he was not under arrest and that he was free to leave at any time, which SPARKS appeared to understand. Throughout the ensuing conversation, TFO Molyneux (and later, SA Krieg) stood to the side of SPARKS at a conversational distance, and situated himself so as to avoid blocking SPARKS' path of travel or access to the door. In addition, throughout the conversation TFO Molyneux (and later, SA Krieg) spoke in a calm, normal tone of voice at a conversational volume loud enough for SPARKS to be able to hear but not so loud as to be easily overheard by other people in the vicinity. Throughout the conversation SPARKS spoke in a similarly calm and conversational manner at an appropriate volume.

16. All TFOs were wearing plain clothes and were not visibly displaying firearms or other weapons, and each identified themselves as agents of the Drug Enforcement Administration and

4

displayed their law enforcement credentials so they could be inspected by the traveling companions. The conversations all took place in close proximity to each other, approximately 30 feet to 40 feet from the exit from the terminal to the curb, and at all times SPARKS, Flores, and Opsina had clear, unobstructed paths to walk away from the conversations had they chosen to do so.

17. TFO Molyneux asked SPARKS if he was traveling with Flores and Opsina, and SPARKS stated that he was. SPARKS noted he had grown up with Flores. SPARKS stated he had come from Dallas, Texas, and in response to TFO Molyneux's question stated that he lived in Texas but was originally from California. TFO Molyneux asked why SPARKS had traveled to California that day and SPARKS stated he was there to visit for a few days and possibly to visit family. TFO Molyneux knew SPARKS was scheduled to fly back to Dallas in less than 30 hours, which when one considered travel time to and from the airport and the time necessary to clear security at the airport, scarcely gave SPARKS one full day to visit the area or to see family.

18. TFO Molyneux asked where SPARKS and his companions planned to stay during their visit, and SPARKS stated he had not made any plans or booked a hotel reservation or reserved a car, but that the trio might rent a car and might rent an AirBNB.

19. TFO Molyneux explained to SPARKS that he and the other officers were part of a task force attempting to control the drug trafficking trade through the use of airports. TFO Molyneux asked SPARKS if he was carrying any drugs or anything illegal, and SPARKS said he was not. TFO Molyneux asked SPARKS for his consent to search his luggage. In response, SPARKS said, "sure." SPARKS then removed his backpack from his back and handed it to TFO Molyneux, which TFO Molyneux understood to be a further indication of his consent.

20. Based on SPARKS' consent, TFO Molyneux began to search SPARKS' backpack. As he began to search, TFO Molyneux noticed SPARKS appeared to grow increasingly nervous and became quiet. Upon opening SPARKS' backpack TFO Molyleux noticed there was no clothing in the

backpack. Instead, TFO Molyneux found several rubber-banded bundles of U.S. Currency; two bundles inside SPARKS' wallet (which was found inside the backpack), and two bundles in interior pockets of the backpack. A quick examination revealed the cash appeared to be all $100 bills and $50 bills.

21. In his training and experience, TFO Molyneux recognized the manner in which the currency was packed as consistent with narcotics smuggling. Specifically, the bundling of the money in rubber-banded stacks, the use of $50 and $100 bills (rather than an assortment of denominations), and the concealment of the money were methods of transporting money that TFO Molyneux had observed used by narcotics traffickers in other investigations in which he had worked.

22. TFO Molyneux asked SPARKS how much money he had in his possession, but SPARKS did not offer a response. TFO Molyneux asked SPARKS several times if SPARKS could estimate how much money he was carrying, but SPARKS only stated that he did not know. TFO Molyneux asked SPARKS if the money belonged to SPARKS, but SPARKS did not answer. Instead, he stood in silence and stared at the encounter taking place nearby between TFO Maes and Flores. To TFO Molyneux, SPARKS appeared to be frozen with nervousness.

23. TFO Molyneux again asked SPARKS about the purpose of his trip to California and why he had so much money with him. SPARKS reaffirmed that he was just on vacation with Flores and Ospina for a few days, but offered no information about the money he was carrying. TFO Molyneux asked SPARKS if the money belonged to Flores, and SPARKS would not answer. TFO Molyneux asked whether Flores and Ospina had money with them, and SPARKS stated he did not know.

24. Having evaded answering questions about the money found in his backpack for several minutes, SPARKS changed his mind and began answering questions. SPARKS stated he was merely a courier of the money, and that "they" (who he would not identify) told him to bring the money from Texas to California. SPARKS said he had brought money to California on several other occasions for "them," and that he assumed the money was to purchase drugs but he did not know for sure because he

6

was only a courier. SPARKS said "they" paid him for his travel, but he did not state whether he was paid a fee to bring the money to California. TFO Molyneux asked why he would act as a money courier if he was not paid a fee, but SPARKS did not respond. TFO Molyneux asked whether Flores and Ospina were also couriers, and SPARKS said he did not know and whatever they were doing was on them and their own doing. SPARKS could not provide any details about where he was supposed to take the money once he arrived in California. He insisted he truly did not know how much money he was transporting, and said he was only doing his job as a courier moving money from Texas to California. He then refused to provide any further details about the money in his possession or his work couriering money.

25. In his training and experience TFO Molyneux knows it is highly unusually for legitimate tourists and visitors to travel with large amounts of cash, and that they (like most people in their daily lives) generally prefer to use credit cards and other forms of electronic payment. He further knows that individuals involved in the purchase and/or sale of controlled substances frequently bring large amounts of cash when traveling to California to purchase controlled substances or to pay for previously-purchased controlled substances, and that individuals who sell controlled substances usually prefer to be paid in cash to avoid creating a paper trail.

26. TFO Molyneux asked SPARKS about his finances, and SPARKS said he had three jobs: working in an ice cream parlor; working as a barista; and working as a tattoo artist. SPARKS said none of his jobs paid very well and that he was just starting out as a tattoo artist. He could not recall how much income he made in 2019, but said he had filed his income taxes.

27. TFO Molyneux explained to SPARKS the U.S. Currency was going to be detained based on the totality of the circumstances, as he suspected the money was brought to California with the intent to purchase drugs or was the proceeds of a drug transaction. SPARKS did not protest the seizure and did not provide any further explanation for being in possession of such a large sum of U.S. Currency.

28. TFO Molyneux secured currency in a DEA self-sealing evidence envelope, which was witnessed by SA Krieg and SPARKS. TFO Molyneux provided SPARKS with a receipt for the currency, and explained the asset forfeiture process to SPARKS, who appeared to understand. TFO Molyneux and SA Krieg provided their business contact information on the receipt and SPARKS signed the receipt and was given a copy. SPARKS also signed the DEA self-sealing envelope as the owner/possessor of the currency. SPARKS stated he did not have any questions or an attorney, and the interview ended at approximately 2:10 p.m., approximately 15 minutes after it began.

29. Shortly after separating from SPARKS, TFO Molyneux placed the DEA self-sealing evidence envelope containing the U.S. Currency under a luggage cart near a United Airlines luggage carousel. Earlier that morning (at approximately 10:00 a.m.), TFO Bertolozzi had his certified drug detection canine, Cooper, examine the area around the United Airlines luggage carousel and the surround area. At that time, Cooper did not alert to any drug odors in the area. At approximately 2:18 p.m., after the bag containing the currency seized from SPARKS had been placed under the luggage cart, Cooper alerted to the odor of drugs when he came upon the luggage cart, indicating to TFO Bertolozzi that the odor of narcotics was emanating from the currency.

30. TFO Molyneux maintained custody and control of the DEA self-sealing evidence envelope until he and TFO Bertolozzi transported it to Bank of America. Once there, the money in SPARKS' possession was counted and determined to be $40,000.00.

31. TFO Molyneux subsequently obtained a report of SPARKS' work history from the State of Texas. According to the State of Texas, for 2018 and 2019 combined, SPARKS had a total of $18,322.10 of reportable income: $15,293.67 in 2019 and only $3,028.39 in 2018. Notably, SPARKS' sources of income included a machine operating company, coffee shops, and an ice cream parlor, but no tattoo parlors.

32. Travel records from American Airlines reveal that despite having little income in 2019,

SPARKS flew between Dallas and California on at least one prior occasion that year and to Eurpoe on at least two occasions. Specifically, on April 22, 2019, SPARKS flew from Dallas Fort Worth Airport (DFW) to SFO, and returned to Dallas four days later, on April 26, 2019, on a flight from LAX to DFW. On March 19, 2019, SPARKS flew from DFW to Madrid, Spain, and then on to Berlin, Germany. He returned to Madrid from Germany on March 26, 2019 (American Airlines had no record of SPARKS' return to the United States). And on November 8, 2019, SPARKS flew from JFK Airport in New York City to London (again, American Airlines had no record of SPARKS' return to the United States).

33. In his training and experience, TFO Molyneux recognizes such substantial travel by someone with so little reported income and who claims employment as a barista, an ice cream parlor employee, and a tattoo artist, as evidence that the travel is being funded by criminal proceeds. It should be noted that these travel records only relate to travel taken on American Airlines.

34. The DEA timely initiated administrative forfeiture proceedings against the Defendant Property. On November 27, 2019, DEA received a timely claim for the Defendant Property from SPARKS. Pursuant to 18 U.S.C. § 983(a)(3)(A) the United States thereafter had ninety (90) days within which to initiate judicial forfeiture proceedings. The instant complaint is filed within that 90-day time limit.

**CLAIM FOR RELIEF**

1. The United States incorporates by reference the allegations in paragraphs 1 through 34 as though fully set forth herein.

2. Title 21, United States Code, Section 841(a) prohibits the manufacture, distribution, or dispensing, and possession with the intent to distribute a controlled substance.

3. Title 21, United States Code, Section 846 makes it a crime to attempt or to conspire to violate Title 21, United States Code, Chapter 13, Subchapter I, including Title 21, United States Code, Sections 841(a).

4. Title 21, United States Code, Section 853 provides that any person convicted of violating (among other things) Title 21, United States Code, Sections 841(a) and 846 shall forfeit any property constituting or derived from any proceeds the person obtained, directly or indirectly, as the result of that violation, and any of the person's property used, or intended to be used, in any manner or part, to commit or to facilitate the commission of that offense.

5. Title 21, United States Code, Section 881(a)(6), provides, in part, for the forfeiture of all moneys, securities or other things of value furnished or intended to be furnished to a person in exchange for a controlled substance, all proceeds traceable to such an exchange, and all moneys and securities used or intended to be used to facilitate any violation of Title 21, United States Code, Chapter 13, Subchapter I, including violations of Title 21, United States Code, Sections 841(a) and 846.

6. In light of the foregoing, and considering the totality of the circumstances, there is probable cause to believe that the Defendant Property represents proceeds traceable to money, securities or other things of value furnished to a person in exchange for a controlled substance, or intended to do so, in violation of Title 21, United States Code, Sections 841(a) and 846, and thus subject to forfeiture under Title 21, United States Code, Sections 853 and 881(a)(6).

WHEREFORE, plaintiff United States of America requests that due process issue to enforce the forfeiture of the Defendant Property; that notice be given to all interested parties to appear and show cause why forfeiture should not be decreed; and that judgment of forfeiture be entered; that the Court

///
///
///
///
///
///

10

enter judgment forfeiting the Defendant Property; and that the United States be awarded such other relief as may be proper and just.

DATED: February 25, 2020

Respectfully submitted,

DAVID L. ANDERSON
United States Attorney

/s/ Karen D. Beausey
Karen D. Beausey
Assistant United States Attorney

**VERIFICATION**

I, Drug Enforcement Administration Task Force Agent Blake Molyneux, state as follows:

1. I am a Task Force Agent with the Drug Enforcement Administration. I am a case agent assigned to this case. As such, I am familiar with the facts and the investigation leading to the filing of this Complaint for Forfeiture.

2. I have read the Complaint and believe the allegations contained therein to be true.

*   *   *   *   *

I declare under penalty of perjury that the foregoing is true and correct. Executed this 25TH day of February, 2020, in SAN FRANCISCO, California.

Task Force Agent Blake Molyneux
Drug Enforcement Administration

12

JS-CAND 44 (Rev. 07/19)

# CIVIL COVER SHEET

The JS-CAND 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved in its original form by the Judicial Conference of the United States in September 1974, is required for the Clerk of Court to initiate the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

**I. (a) PLAINTIFFS**
United States of America

**DEFENDANTS**
$40,000 in United States Currency

**(b)** County of Residence of First Listed Plaintiff
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
AUSA Karen Beausey
450 Golden Gate Avenue
San Francisco, CA 94102

Attorneys *(If Known)*

**II. BASIS OF JURISDICTION** *(Place an "X" in One Box Only)*

[X] 1 U.S. Government Plaintiff
[ ] 2 U.S. Government Defendant
[ ] 3 Federal Question *(U.S. Government Not a Party)*
[ ] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

**III. CITIZENSHIP OF PRINCIPAL PARTIES** *(Place an "X" in One Box for Plaintiff and One Box for Defendant)* *(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | 1 | 1 | Incorporated *or* Principal Place of Business In This State | 4 | 4 |
| Citizen of Another State | 2 | 2 | Incorporated *and* Principal Place of Business In Another State | 5 | 5 |
| Citizen or Subject of a Foreign Country | 3 | 3 | Foreign Nation | 6 | 6 |

**IV. NATURE OF SUIT** *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | [X] 625 Drug Related Seizure of Property 21 USC § 881 | 422 Appeal 28 USC § 158 | 375 False Claims Act |
| 120 Marine | 310 Airplane | 365 Personal Injury – Product Liability | 690 Other | 423 Withdrawal 28 USC § 157 | 376 Qui Tam (31 USC § 3729(a)) |
| 130 Miller Act | 315 Airplane Product Liability | 367 Health Care/ Pharmaceutical Personal Injury Product Liability | **LABOR** | **PROPERTY RIGHTS** | 400 State Reapportionment |
| 140 Negotiable Instrument | 320 Assault, Libel & Slander | | 710 Fair Labor Standards Act | 820 Copyrights | 410 Antitrust |
| 150 Recovery of Overpayment Of Veteran's Benefits | 330 Federal Employers' Liability | 368 Asbestos Personal Injury Product Liability | 720 Labor/Management Relations | 830 Patent | 430 Banks and Banking |
| 151 Medicare Act | 340 Marine | **PERSONAL PROPERTY** | 740 Railway Labor Act | 835 Patent—Abbreviated New Drug Application | 450 Commerce |
| 152 Recovery of Defaulted Student Loans (Excludes Veterans) | 345 Marine Product Liability | 370 Other Fraud | 751 Family and Medical Leave Act | 840 Trademark | 460 Deportation |
| | 350 Motor Vehicle | 371 Truth in Lending | 790 Other Labor Litigation | **SOCIAL SECURITY** | 470 Racketeer Influenced & Corrupt Organizations |
| 153 Recovery of Overpayment of Veteran's Benefits | 355 Motor Vehicle Product Liability | 380 Other Personal Property Damage | 791 Employee Retirement Income Security Act | 861 HIA (1395ff) | 480 Consumer Credit |
| 160 Stockholders' Suits | 360 Other Personal Injury | 385 Property Damage Product Liability | | 862 Black Lung (923) | 485 Telephone Consumer Protection Act |
| 190 Other Contract | 362 Personal Injury -Medical Malpractice | | **IMMIGRATION** | 863 DIWC/DIWW (405(g)) | 490 Cable/Sat TV |
| 195 Contract Product Liability | **CIVIL RIGHTS** | **PRISONER PETITIONS** | 462 Naturalization Application | 864 SSID Title XVI | 850 Securities/Commodities/ Exchange |
| 196 Franchise | 440 Other Civil Rights | **HABEAS CORPUS** | 465 Other Immigration Actions | 865 RSI (405(g)) | 890 Other Statutory Actions |
| **REAL PROPERTY** | 441 Voting | 463 Alien Detainee | | **FEDERAL TAX SUITS** | 891 Agricultural Acts |
| 210 Land Condemnation | 442 Employment | 510 Motions to Vacate Sentence | | 870 Taxes (U.S. Plaintiff or Defendant) | 893 Environmental Matters |
| 220 Foreclosure | 443 Housing/ Accommodations | 530 General | | 871 IRS–Third Party 26 USC § 7609 | 895 Freedom of Information Act |
| 230 Rent Lease & Ejectment | 445 Amer. w/Disabilities– Employment | 535 Death Penalty | | | 896 Arbitration |
| 240 Torts to Land | | **OTHER** | | | 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| 245 Tort Product Liability | 446 Amer. w/Disabilities–Other | 540 Mandamus & Other | | | |
| 290 All Other Real Property | 448 Education | 550 Civil Rights | | | 950 Constitutionality of State Statutes |
| | | 555 Prison Condition | | | |
| | | 560 Civil Detainee– Conditions of Confinement | | | |

**V. ORIGIN** *(Place an "X" in One Box Only)*

[X] 1 Original Proceeding
[ ] 2 Removed from State Court
[ ] 3 Remanded from Appellate Court
[ ] 4 Reinstated or Reopened
[ ] 5 Transferred from Another District *(specify)*
[ ] 6 Multidistrict Litigation–Transfer
[ ] 8 Multidistrict Litigation–Direct File

**VI. CAUSE OF ACTION**
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Title 21, United States Code, Sections 853 and 881(a)(6)
Brief description of cause:
Drug Related Forfeiture

**VII. REQUESTED IN COMPLAINT:**
CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, Fed. R. Civ. P.
**DEMAND $**
CHECK YES only if demanded in complaint:
**JURY DEMAND:** [ ] Yes [X] No

**VIII. RELATED CASE(S), IF ANY** *(See instructions)*:
JUDGE
DOCKET NUMBER

**IX. DIVISIONAL ASSIGNMENT (Civil Local Rule 3-2)**
*(Place an "X" in One Box Only)*
[X] SAN FRANCISCO/OAKLAND
[ ] SAN JOSE
[ ] EUREKA-MCKINLEYVILLE

DATE 02/25/2020

SIGNATURE OF ATTORNEY OF RECORD